IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**BARBARA ANN JOHNSON,**

      **Plaintiff,**

**v.**                         **Case No. 3:06cv188-MCR/EMT**

**DONALD C. WINTER, SECRETARY
DEPARTMENT OF THE NAVY,**

      **Defendant.**

_____/

**STATEMENT OF FACTS RELIED UPON IN SUPPORT
OF FEDERAL DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      **The Plaintiff**

1.     The plaintiff has been employed at the Naval Education & Training Professional Development & Technology Center (NETPDTC) with the Department of the Navy since August 16, 1998.  (Exhibit 1, SF-50, effective 8/16/1998).

2.     Immediately prior to coming to work at NETPDTC, she worked at the Defense Automated Printing Service (DAPS) as a GS-343-09 (Management Analyst). (Exhibit 2, SF-52, effective date 8/16/1998, Request for Personnel Action; & Exhibit 3, Myatt Affidavit @ ¶28).

3.     On October 11, 1997, while employed at DAPS, she was temporarily assigned to a GS-343-11 position for a period not to exceed February 7, 1998. (Exhibit 4, Milhouse Affidavit @ ¶19; & Exhibit 5, SF-50, effective date 10/11/1997).

4.     On February 8, 1998, the plaintiff's temporary appointment to the Grade

11, GS-343 position ended, and she reverted to her permanent Grade 9, GS-343 position

at DAPS.  (Exhibit 4, Milhouse Affidavit @ ¶19; & Exhibit 6, SF-50, effective date

2/8/1998).

**<u>The Plaintiff Came to Work at NETPDTC</u>**

5.     As a result of a Reduction in Force (RIF) closure of DAPS, the plaintiff's

position was being eliminated, and her employment with the Department of the Navy was

to be terminated on August 15, 1998.  (Exhibit 7, SF-50, effective date 8/15/1998;

Exhibit 8, Plaintiff's Declaration, ROI pages 87-89 @ page 93; & Exhibit 3, Myatt

Affidavit @ ¶28).

6.     During such closures, employees scheduled to be displaced are put in the

Department of Defense (DoD) Priority Placement Program (PPP), and are eligible to fill

listed vacancies for positions in GS series and grade levels of permanent positions they

have held previously.  This is sometimes referred to as the "stopper list" or "PPP list."

(Exhibit 9, Rone Affidavit @ ¶7).

7.     Employees are not eligible for promotions from the stopper list. (Exhibit

9, Rone Affidavit @ ¶7).

8.     During such closures, other local organizations are able to offer incentives

for personnel to retire, referred to as a Voluntary Separation Incentive Pay (VSIP) Phase

2, thereby creating a vacancy that might be filled by a potentially displaced employee

such as the plaintiff.  (Exhibit 3, Myatt Affidavit at ¶¶26, 27; & Exhibit 9, Rone Affidavit @ ¶8).

9.      An activity can also utilize the (VSIP) authorities to assist in reorganizing and/or downsizing their own organization.  NETPDTC, like many Navy organizations, was required to participate in Commercial Activities studies and/or a Functional Assessments wherein the functions performed by government employees are subject to a competition – with the potential result being that the functions will be performed by a private corporation instead of government employees.  (Exhibit 3, Myatt Affidavit @ ¶ ¶27, 26; Exhibit 9, Rone Affidavit @ ¶8).

10.     In 1998, an employee at NETPDTC holding a GS-343-13 position in the N6 Department elected to participate in the VSIP Phase 2 process, and to accept a VSIP match and retire.  The plaintiff was not eligible for this position since, although it was in her eligible series (GS-343-Management Analyst), it was at too high a grade level (GS-13).  However, management at the NETPDTC N6 Department utilized a GS-343-09 (PD#TPBPI) Management Analyst "stand-alone" position description (PD) to make a vacancy available for which the plaintiff met the minimum qualifications (GS Series and grade).  (Exhibit 3, Myatt Affidavit @  ¶28 ; & Exhibit 10, McGowan Affidavit, @ ¶¶ 4-5).

11.     This PD(PD#TPBPI) was not a Systems Analyst PD.  The position offered to the plaintiff was not for assignment to the N62 Division and it was not a Systems Analyst position doing IT work.  (Exhibit 4, Myatt Affidavit @ ¶29).

3

12.    That PD was assigned to the N65 Division, and the plaintiff was placed in this position effective August 16, 1998. (Exhibit 11, SF-50 effective 8/16/1998; & Exhibit 10, McGowan Affidavit @ ¶4).

### The Plaintiff's Duties at NETPDTC

13.    The plaintiff was assigned to the N65 Division as a GS-343-09 (Management Analyst), performing clerical and administrative type work, and did not meet the classification standards of the IT Series 2210.  (Exhibit 12, Plaintiff's e-mail of June 4, 2002 regarding her duties; Exhibit 4, Milhouse Affidavit @ ¶¶6 & 11).

14.    The plaintiff's duties in the Department were to submit verified invoices for  materials/service received and submit invoices for payment.  (Exhibit 12, Plaintiff's e-mail of June 4, 2002 regarding her duties).

15.    The plaintiff verified receipt of the service/materials with the employee ("end user") who had placed the request to order the computer materials.  The end user, not the plaintiff, verified that the materials received were in working order before the plaintiff could certify the invoice for payment.  (Exhibit 12, Plaintiff's e-mail of dated June 4, 20002 regarding her duties).

16.    The plaintiff fielded phone calls, such as vendors checking status of payment of invoices.  (Exhibit 12, Plaintiff's e-mail of June 4, 2002 regarding her duties).

17.    The plaintiff also fielded e-mails and faxes, scanned documents, made copies and scheduled meetings, as needed.  (Exhibit12, Plaintiff's e-mail of June 4, 2002

regarding her duties).

18.     The plaintiff helped end users with warranty items and with the return of materials. (Exhibit 12, Plaintiff's e-mail of June 4, 2002 regarding her duties).

19.     The plaintiff tracked and monitored the expenditure of funds for contracts for supply materials/services.  (Exhibit 12, Plaintiff's e-mail of June 4, 2002 regarding her duties).

20.     The plaintiff also maintained a log of invoices processed and items received on each contract/invoice.  (Exhibit 12, Plaintiff's e-mail of June 4, 2002 regarding her duties).

21.     The plaintiff ordered, charged, and activated beepers for employees, contacted customers regarding the status of their beeper request, or notified them to pick up their beeper. (Exhibit 12, Plaintiff's e-mail of June 4, 2002 regarding her duties).

### **IT Series 334 and IT Series 2210**

22.     In 1991, the Office of Personnel Management (OPM) issued new standards for the GS-334 (Computer Specialist) series and defined the GS-334 positions as:

> The work in this series includes responsibility for analyzing, managing, supervising, or performing work necessary to plan, design, develop, acquire, document, test, implement, integrate, maintain, or modify systems for solving problems or accomplishing work processes by using computers.  Positions are included in this series when the primary need is knowledge of information processing methodology/technology, computer capabilities, and processing techniques.

5

(Exhibit 13, OPM Computer Specialist Series, July 1991, TS-106 @ page 1).

23.     In the mid-1990's, NETPDTC management recognized that the role of some of the Grade 11 and Grade 12 Systems Analyst positions in the GS-343 series assigned to the N62 Division had changed from a purely functional role to one of functional and technical and was more properly classified in the GS-334 (Computer Specialist) Series so they rewrote the GS 343-12 and GS-343-11 Systems/Management Analyst PDs, correctly reflecting the assigned duties and skills/knowledge of those positions, and submitted them to the Human Resource Office (HRO) for an advisory classification. (Exhibit 14, Synopsis of Events/Attempts to Convert N62 GS-343s to GS-334s; Exhibit 15, Declaration of Don Cook, at ROI pages 117-128 @ Q-2 on page 108; Exhibit 3, Myatt Affidavit, @ ¶¶8-9).

24.     The advisory indicated the positions, utilizing the TS-106, were more properly classified as GS-334, Computer Specialist (Systems Analyst) rather than GS-343, Management Analyst.  On March 26, 1996, the two PD's were signed and became official classified positions.  They were PD# XPBOO – GS-334-12 Computer Specialist (Systems Analyst) and PD# XPBON - GS-334-11 Computer Specialist (Systems Analyst) (Exhibit 16, Position Description XPBOO; Exhibit 17, Position Description XPBON; Exhibit 3, Myatt Affidavit @ ¶10; Exhibit 10, McGowan Affidavit @ ¶9).

25.     The purpose of PD # XPBOO is stated as:

> The purpose of this position is to accomplish the computer
> system analysis and related data systems functions listed below.
> These  incumbent will serve as project leader over designated

6

> system/subsystem development/maintenance efforts within the
> branch.  Duties involve Central Design Agency (CDA) functions
> requiring advanced competence in design and development of
> complex on-line, interactive systems linked to multiple networks
> and interfaces among varied type client-servers, concentrators,
> database network servers, communications servers, minicomputer
> and large scale computers, each having unique characteristics.

(Exhibit 16 at "Major Duties" Section).

26.     The purpose of PD # XPBON is stated as:

> The purpose of this position is to accomplish the computer
> system analysis and related data systems functions listed below.
> These duties may be carried out on an individual or branch
> membership basis.  Duties involve Central Design Activity (CDA)
> functions requiring competence in design and development of
> complex on-line, interactive systems linked to multiple networks
> and interfaces among varied type client-servers, concentrators,
> database network servers, communicating servers, minicomputer and large
> scale computers, each having unique characteristics.

(Exhibit 17 @ "Major Duties" section).

27.     There was no GS-343-09 PD that was classified as GS-334-09 in this 1996

process.  (Exhibit 10, McGowan Affidavit @ ¶10).

28.  In the 1990's, no salary increase was attached to reassignment to the IT Series

334.  (Exhibit 15, Declaration of Don Cook at ROI pages 117-128 @ page 118 @ answer

to Q-2;  Exhibit 3, Myatt Affidavit @ ¶10; Exhibit 10, McGowan Affidavit @ ¶9).

29.     Since no money was attached to the conversion, management made the

decision not to complete the necessary paperwork to convert those GS-343, Grade 11 and 12

employees to the GS IT Series 334 at that time.  (Exhibit 15, Declaration of Don Cook at

ROI pages 117-128 @ page 118 @ answer to Q-2;  Exhibit 3, Myatt Affidavit @ ¶10; &

Exhibit 10, McGowan Affidavit @ ¶9).

30.    In 2000, as an effort to aid in recruitment and retention of trained and skilled IT employees, OPM established an incentive pay (Information Technology or "IT" pay) for positions in the IT field, and it created a new IT series, known as Series 2210. (Exhibit 18, OPM Memo of July 17, 2000 @ page 419; Exhibit 9, Rone Affidavit @ ¶¶9-10; Exhibit 10, McGowan Affidavit @ ¶6; Exhibit 3, Myatt Affidavit @ ¶11; & Exhibit 19, OPM memo dated November 3, 2000 at ROI page 380).

31.    The OPM directive addressed an automatic conversion of IT Series 334 positions to Series 2210, and automatic entitlement to IT pay for GS-334 employees. However, the directive did not address conversion of employees in any series other than IT Series 334. (Exhibit 10, McGowan Affidavit @ ¶7).

### Conversions to IT Series 2210

32.    When the IT pay became effective in January 2001, some GS-343, Grade 11 and 12 employees who did IT work, such as designing computer programs or computer systems analyst type work, still had not been converted from Series 343 PDs to Series 334 PDs that had been classified and established in 1996.  (Exhibit 10, McGowan Affidavit @ ¶¶7-8;  Exhibit 3, Myatt Affidavit of Gene Myatt @ ¶12).

33.    The plaintiff alleges that "there was a group of disgruntled 343's who went to management because they were working side by side with 334's and the 334's received IT pay and they did not.  They met with management and as a result of that meeting, they received IT pay."  (Exhibit 8, Plaintiff's Declaration @ ROI page 95).

8

34.     Even though the OPM directive was silent as to conversion for employees in any Series other than IT Series 334, these Series 343 GS-12 and GS-11 grade employees who were doing systems management/analyst type work approached management and requested that they be converted to the GS- 334 PD's that had been established in 1996 and receive the attendant salary increases. (Exhibit 3, Myatt Affidavit @ ¶ 12;  Exhibit 10, McGowan Affidavit @ ¶¶7-8).

35.     The plaintiff, as a GS-343-09, was not part of this initial group.  (Exhibit 3, Myatt Affidavit @ ¶13).

36.     Realizing that these employees, and possibly others, were actually doing IT work and were the type of IT employees that the new directive sought to recruit and retain, NETPDTC management decided to have HRO review the PD of each Series 343 employee in order to determine whether the PD fit the criteria for IT Series 2210 (or the outgoing 334 Series).  Each employee was to review his or her individual PD with his or her supervisor and certify that it was correct and accurately described the employee's work before it was submitted to HRO.  (Exhibit 9, Rone Affidavit @ ¶11; Exhibit 20, Rone e-mail @ ROI page 27; Exhibit 10, McGowan Affidavit @ ¶¶10-11; Exhibit 3 Myatt Affidavit @ ¶14; & Exhibit 25, McGowan Memo re: Circumstances Related to This Issue, ROI page 33).

37.     Mr. Cook did not have the authority at NETPDTC to classify the positions.  That was the ultimate responsibility of Mr. Gene Myatt, the N8 Department Head at NETPDTC.  (Exhibit 10, McGowan Affidavit @ ¶24).

38.     Since NETPDTC is a "Managing to Payroll" (MTP) activity, the HRO advisory classifications rendered were not binding but only advisory.  Don Cook, as a Department manager, had the authority to make decisions regarding personnel actions but he did not have classification authority.  At the time that the plaintiff was seeking conversion to an IT Series 2210 PD, Gene Myatt, Comptroller, had classification authority for NETPDTC and, as such, he had the authority to accept the HR advisory determinations or reject them.  Gene Myatt was the sole person with the authority to classify positions, regardless of the advice of HRO.  (Exhibit 4, Milhouse Affidavit @ ¶8; Exhibit 3, Myatt Affidavit @ ¶¶4-5).

39.     At NETPDTC, the N8 group of HR liaisons conducted the position management review on all of the personnel actions requested by Department Heads.  The HR liaisons certified whether the duties and grade level suggested by a Department Head for a position under his/her mission was supported.  If it was, the PD was forwarded to the Comptroller/Executive Director for official classification.  If not, the PD was returned to the Department Head for further review.  (Exhibit 4, Milhouse Affidavit @ ¶9).

40.     At NETPDTC, advisory classification opinions from the classifiers and other specialists at the local HRO were often obtained.  (Exhibit 3, Myatt Affidavit @ ¶7).

41.     Even though NETPDTC had Manage to Payroll authority, it was often subject to controls on billets, vacancies, and promotions.  These controls were placed on NETPDTC by the higher echelon Command, Naval Education and Training Command

(NETC), formerly, Chief of Naval Education & Training Command (CNET).  (Exhibit 3,
Myatt Affidavit @ ¶6).

42.     Once the PDs were certified as an accurate description of the particular
employees' duties, the PDs were sent to the Human Resources Office (HRO) in
Pensacola for review and comparison with the OPM directive and classification
standards.  (Exhibit 21, Declaration of Rita Rone @ ROI pages 143-149 @ page 144 @
answer to Q-11; Exhibit 9, Rone Affidavit at ¶11; Exhibit 20, Rone e-mail @ ROI pages
27-28@ page 27; Exhibit 10, McGowan Affidavit @ ¶11; Exhibit 3, Myatt Affidavit @
¶14; & Exhibit 4, Milhouse Affidavit @ ¶10).

43.     In May 2001, HRO provided an opinion to management as to whether
each individual PD met the criteria and should, therefore, be assigned to an IT series PD.
(Exhibit 10, McGowan Affidavit @ ¶13; Exhibit 3, Myatt Affidavit @ ¶16; & Exhibit 22,
HRO Advisory Opinion Memo of May 23, 2001).

44.     Actions were taken to effect the advisory decisions provided and in June
2001, GS-343, N-62 employees who were properly classified to the 1996 GS-334 PD
(GS-11 & GS-12) were reassigned to those PD's and became entitled to and received IT
pay.  (Exhibit 10, McGowan affidavit @ ¶14).

45.     There were GS-343 members of the plaintiff's race who were converted to
GS-334 and received IT pay in June 2001 and there were members not of the plaintiff's
race who were not converted and who did not receive IT pay in June.  When she was
ultimately converted to the Series 2210 IT PD, the plaintiff was the first and only GS-

11

343, grade 9, employee who was converted to an IT series during that time period. (Exhibit 10, McGowan Affidavit @ ¶15).

46.     The plaintiff's PD was also reviewed during this process in May 2001, and HRO determined that her PD was properly classified as a GS-343-09 (Management Analyst). (Exhibit 10, McGowan Affidavit @ ¶¶12, 13; Exhibit 3, Myatt Affidavit @ ¶ ¶15, 16; Exhibit 4, Affidavit of Genie Milhouse @ ¶11; & Exhibit 9, Rone Affidavit @ ¶¶12-13).

47.     If the PD met the criteria for assignment to the IT series (GS-334 or the new 2210), Mr. Cook, as the Department Head had to certify that the employee was qualified to convert to the new PD, and the employee was converted to IT Series (334 or new 2210) PD.  (Exhibit 4, Milhouse Affidavit @ ¶14; Exhibit 23, Cowan  Affidavit @ ¶10; & Exhibit 9, Rone Affidavit @ ¶18).

48.     The GS-343, Grade 11 & 12 employees who should have been on the 1996 PD's  converted quickly (June 2001) while other GS-343 employees were not and, in fact, some employees were never converted to the IT Series 334 or 2210.  (Exhibit 24, Myatt e-mail of October 10, 2001, @ ROI pages 250-251 @ 250;  Exhibit 25, McGowan Memo @ ROI pages 33-34; Exhibit 3, Myatt Affidavit @ ¶17; Exhibit 10, McGowan Affidavit @ ¶14; & Exhibit 22, HRO Memo of Advisory Opinions).

49.     The employees who were converted quickly (June 2001 time frame) were employees who had "paramount IT work" in their PD's and did work, such as actually designing computer programs or systems and were in the GS Grade of 11 or higher.

(Exhibit 26, Chart of Reassigned Employees @ ROI pp 267-270; & Exhibit 10, McGowan Affidavit @ ¶13).

50.    In September 2001, the plaintiff requested that she be converted to the IT Series 2210, and although other employees of her race had been converted, and others not of her race had not been converted, she indicated she believed she was being discriminated because of her race.  She was advised at that time that she could seek EEO counseling in accordance with the regulations. (Exhibit 9, Rone Affidavit @ ¶14).

51.    In September 2001, after questioning whether her name had been removed from a list of people to receive IT pay based upon another employee, Cliff Blackmon, telling her that her name had been on such a list, she was advised that several lists were developed over the course of the classification review and that she had been on a list of PD's to be reviewed as part of the process in which all 343 PD's were reviewed by HRO. (Exhibit 24, Myatt e-mail at ROI pages 250-251@ page 250; Exhibit 27, McGowan e-mail of September 19, 2001 at ROI page 566; Exhibit 10, McGowan Affidavit @ ¶¶17-18; Exhibit 3, Myatt Affidavit @ ¶¶19-20; Exhibit 8, Plaintiff's Declaration @ ROI page 95).

52.    The plaintiff was informed that her name had been on a list of GS-343 PD's that were reviewed but her name was not on a list of employees approved to receive IT pay in 2001.  (Exhibit 10, McGowan Affidavit @ ¶18; Exhibit 3, Myatt Affidavit @ ¶20).

53.    The plaintiff was also advised that, at least one of the lists that had been

13

generated during the Series 2210 conversion review process was prepared for financial planning purposes to project the financial impact to the Command if certain GS-343 positions were converted to the IT 2210 Series.  (Exhibit 3, Myatt Affidavit @ ¶21).

54.    The plaintiff was also told that she was not the only GS-343 employee whose PD had been determined by HRO to be properly classified in the GS-343 Series and,  therefore, not converted to the IT 2210 Series.  (Exhibit 3, Myatt Affidavit @ ¶22).

55.    Clifford Blackmon was not a management official at NETPDTC nor was he involved in the classification of PDs in the N6 Department.  His only role was to informally represent the N62 group of GS-343, Grade 11 & 12 employees, who were doing Systems Analyst work and whose PDs were rewritten in 1996 as GS-334s.  The plaintiff was not a part of this N62 group as she was not a GS-11 or 12 grade employee nor was she doing the level of work or nature of work that would constitute Systems Analyst (334) duties.  (Exhibit 3, Myatt Affidavit @ ¶25).

56.    She was further advised that since she now claimed her PD was not accurate, that she and her supervisor again review, correct/rewrite her PD (keeping in mind that  the threshold for the HRO classifier was that IT knowledge, skills, and abilities were paramount for successful performance of the job), certify it again as correct and it would then be forwarded to HRO.  (Exhibit 24, Myatt e-mail @ ROI pages 250-251 @ page 250; Exhibit 27, McGowan e-mail @ ROI page 266; Exhibit 9, Rone Affidavit @ ¶¶15-16; Exhibit 3, Myatt Affidavit @ ¶23; & Exhibit 10, McGowan Affidavit @ ¶¶19-20).

14

57.     Even though he did not have to do so, Mr. Cook allowed the plaintiff to review her PD with her supervisor again, change and re-certify it, and it was re-submitted to HRO.  (Exhibit 9, Rone Affidavit @ ¶16).

58.     After the plaintiff's PD was submitted to HRO, HRO issued an advisory opinion that the plaintiff did not have paramount IT work in her PD and it did not fit the criteria for the IT Series 2210.  (Exhibit 28, Rone's e-mail of December 19, 2001 @ ROI pages 215-216; Exhibit 9, Affidavit of Rita Rone @ ¶¶ 13, 17; Exhibit 3, Affidavit of Gene Myatt @ ¶16; and Exhibit 10, Affidavit of Bruce McGowan @ ¶¶19, 21).

59.     In order for the plaintiff to be entitled to IT pay, the Command had to have a valid PD that classified as a GS-2210-09 to which they could assign her.  (Exhibit 4, Milhouse Affidavit @ ¶12).

60.     Over the next several months, members of the NETPDTC staff worked with the plaintiff and with the HRO staff in rewriting the plaintiff's PD in an effort to reclassify her PD as a GS-2210 PD.  Had these efforts not been made, the plaintiff would have remained properly classified as a GS-343 and would not have received IT pay.  (Exhibit 3, Myatt Affidavit @ ¶24; & Exhibit 10, McGowan Affidavit @ ¶ 21).

61.     The plaintiff's PD was re-written three or four times.  (Exhibit 29, Plaintiff's Affidavit @ ROI page 95).

62.     Through these continuing efforts, the plaintiff's PD content was changed considerably and her PD was reclassified to the 2210 series, effective May 19, 2002 and she received an annual pay increase of $8,830.00.  (Exhibit 3, Myatt Affidavit @ ¶24;

Exhibit 4, Milhouse Affidavit @ ¶13; & Exhibit 10, McGowan Affidavit @ ¶22).

63.    As required by HRO for all employees being reassigned to a GS-2210 position when they had not previously been a GS-334, Mr. Cook then signed a waiver, stating that the plaintiff was "minimally qualified" for the IT position with the IT elements that had been added to her PD.  (Exhibit 10, McGowan Affidavit @ ¶¶22-23; Exhibit 4, Milhouse Affidavit @ ¶14).

64.    NETPDTC employees who were either eligible to convert from IT Series 334 to IT Series 2210 or from Series 343 to IT Series 2210 worked for NETPDTC at locations all over the United States. (Exhibit 9, Rone Affidavit @ ¶19).

65.    Several Series 343 employees were converted to the IT Series 2210 after the plaintiff was converted to Series 2210.  (Exhibit 26, List of Converted Employees @ ROI pages 267-268; & Exhibit 10, McGowan Affidavit @ ¶15).

66.    There is no pattern based upon race or national origin in the conversions of Series 343 employees to IT Series 2210.  (Exhibit 9, Rone Affidavit @ ¶20).

67.    When asked what made the plaintiff think Mr. Cook discriminated against her and whether he had done or said anything in the past to cause her to believe that he would discriminate against her or anyone based upon race, the plaintiff said that Mr. Cook kept telling her that she was not qualified.  (Exhibit 8, Plaintiff's Declaration at ROI page 96).

68.    When asked what Mr. Cook based his conclusion on regarding the plaintiff's lack of qualifications, the plaintiff initially said that Mr. Cook was trying to

base her qualifications on IT work but the plaintiff later struck through this response and added the notation, "Don't know what this is." (Exhibit 8, Plaintiff's Declaration @ ROI page 96).

69.    The plaintiff further stated that Mr. Cook asked her if she had taken any recent computer courses which she had not. (Exhibit 8, Plaintiff's Declaration @ ROI page 96).

70.    Regarding Mr. Cook, the plaintiff alleged, "He said he picked me up when I was losing my job; it is like he is holding it against me." (Exhibit 8, Plaintiff's Declaration @ ROI page 101).

### "Back Pay"

71.    None of the NETPDTC GS-343 employees who were reassigned to the 1996 GS-334 PD or those who were converted from a GS -343 to a GS-2210 received retroactive pay because retroactive pay was not authorized under the reclassification to the new IT  PD. (Exhibit 31, OPM Memo dated June 5, 2001, @  ROI page 379; Exhibit 10, McGowan Affidavit @ ¶16; Exhibit 3, Myatt Affidavit @ ¶18;  Exhibit 32, McGowan e-mail dated May 30, 2002 @ ROI pages 571-572 @ page 572 ; & 5 C.F.R. §511.701).

72.    Additionally, according to OPM rules and the Code of Federal Regulations, an employee is only entitled to the pay of a position effective the date that he is officially reassigned or reclassified to the position. (Exhibit 10, McGowan Affidavit @ ¶16).

## **GS-12 and 13 Work**

73.    Within each GS level, there are a range of levels of duties and responsibilities. (Exhibit 4, Milhouse Affidavit @ ¶17; Exhibit 9, Rone Affidavit @ ¶21).

74.    When employees leave NETPDTC and are not replaced or not immediately replaced, their duties and responsibilities are reassigned to other employees. (Exhibit 9, Rone Affidavit @ ¶22).

75.    Often, Navy organizations are under requirements to conduct functional assessments and to reorganize in order to obtain cost savings.  These requirements can sometimes lead to involuntary downgrades, involuntary separations, and limitations on filling vacancies or restructuring positions.  This was true of NETPDTC during 1998-2002 time frame. (Exhibit 33 @ ROI pages 173A- 45-173A-47;  Exhibit 9, Rone Affidavit @ ¶23; & Exhibit 3, Myatt Affidavit @  ¶26).

76.    During the time that the plaintiff has been employed at NETPDTC, the Command has been the subject of several reorganizations and has been under many "hiring freezes" placed by higher authority.  Although the work continues, managers at NETPDTC are often limited in its ability to fill vacancies.  It is not unusual for employees in a Department to assume some responsibilities from another absent employee when the work is comparable in nature and complexity.  (Exhibit 3, Myatt Affidavit @ ¶30).

77.    In the Fall of 2001, GS-343-12 employee Rachael Cowen was temporarily assigned to duties involving the Functional Assessment/Commercial Activities study at

NETPDTC. (Exhibit 23, Cowan Affidavit @ ¶11; & Exhibit 8, Plaintiff's Declaration at ROI page 97).

78.     Some of Ms. Cowen's duties were reassigned to other employees, including the plaintiff. (Exhibit 34  Hendershott/Giles e-mail string at ROI pages 446-447;  Exhibit 23, Cowan Affidavit @ ¶14; & Exhibit 8, Plaintiff's Declaration @ ROI page 97).

79.     At the time of her temporary reassignment, Ms. Cowen managed a computer system that she had designed and that was used by NETPDTC.  (Exhibit 23, Cowan Affidavit @ ¶12).

80.     Ms. Cowen took the management of the computer system with her as she took over her temporary duty assignment.  (Exhibit 23, Cowan Affidavit, @ ¶13).

81.     Some of Ms. Cowen's GS-9 level administrative duties were reassigned to the plaintiff.  Ms. Cowen's GS-11 and GS-12 duties were reassigned to other GS 11 and GS-12 employees.  Ms. Linda Blackmon was a GS-343-11 employee who retired.  Some of her duties were assigned to the plaintiff and others.  (Exhibit 34  Hendershott/Giles e-mail string at ROI pages 446-447; Exhibit 23, Cowan Affidavit @ ¶12).

82.     A review of the plaintiff's duties, as recounted by the plaintiff in an e-mail of June 4, 2002, to her supervisor, Kitty Hendershott, contains duties that are mostly clerical and non-complex technical tasks that range from GS-5/6 through GS7/9 and would not be classified as paramount knowledge of IT duties . (Exhibit 4, Milhouse Affidavit @ ¶¶6-7).

83. These duties that the plaintiff claimed were "higher level" were included in the plaintiff's PD GS-2210 (PD#CPAYU) that was classified at the GS grade 09 level in May 2002. (Exhibit 34 Hendershott/Giles e-mail string at ROI pages 446-447).

84. In determining the series and grade level on a particular PD, the first step taken by the classifier is to validate whether the series proposed is covered in the OPM Occupational Series Handbook. Second, the mission and primary purpose for the positions' existence is reviewed to determine if it meets the selected series definition for coverage. Third, a determination must be made to include or exclude any major duties that are not covered by the selected series for final grading. Then, an analysis of the major duties, knowledge required and level of responsibility described in the PD is checked against the factor level descriptions and work illustration (if available) outlined in the appropriate individual or group OPM Classification Standard. The point value is assigned to each factor and the total number of points determines the grade level of the position. In the process of classifying a position, many variables could impact on the series and grade determination (i.e. if position is considered direct mission or administrative/technical support, supervision/non-supervisroy, the placement of the position in the organization, reporting chain, and degree of independency, etc.). (Exhibit 4, Milhouse Affidavit @ ¶5).

85. Employees may not progress through GS grade levels without serving sufficient "time in grade," which means that an employee would not be qualified or eligible to be promoted to a higher level grade unless he/she had served in the previous

level grade for at least 12 months at some point in his/her career.  (Exhibit 4, Milhouse Affidavit @ ¶18).

86.     Handling duties of a higher GS grade level while assigned to a lower GS grade level does not serve to constitute sufficient time in grade to be promoted to the next higher GS grade level.  (Exhibit 4, Milhouse Affidavit @ ¶15; Exhibit 9, Rone Affidavit @ ¶25).

87.     Even if higher level duties are assigned to an employee, the employee is not automatically entitled to promotion to a higher grade level.  A "desk audit" of the employee's duties could be requested to determine if by assignment of additional duties, the position should be graded at a higher level. (Exhibit 4, Milhouse  Affidavit @  ¶16; Exhibit 9, Rone Affidavit @ ¶26).

88.     Since the plaintiff had only been a GS-343-11 for a temporary period of 4 months while at DAPS, she did not have sufficient time in grade (52 weeks) to be promoted to a GS-12.  (Exhibit 4, Milhouse Affidavit @ ¶19).

89.     Some positions in the federal government, and at NETDPTC, are created as "career ladder" or "upward mobility" positions, meaning that once selected for such a position, the individual assigned can automatically progress through the grade levels assigned to the position as they satisfactory perform during the periods required, normally for 12 month intervals. Other positions are created as "stand-alone" positions that only qualify for one grade assignment. To advance to the next grade level, the employee must be considered for a vacant, established position and compete for the

position.  (Exhibit 10, McGowan Affidavit @ ¶¶25, 29).

90.     "Career ladder" positions are open initially to all employees to compete. (Exhibit 10, McGowan Affidavit  @ ¶25).

91.     The plaintiff's position at NETPDTC was a "stand alone" GS-343-09 position so in order for her to advance to a GS-11 position, she would have to be qualified for, apply for, compete for, and/or be placed in a vacant and established GS-11 position. (Exhibit 9, Rone Affidavit @ ¶27;  Exhibit 10, McGowan Affidavit @ ¶30).

92.     In September 2001, the plaintiff was advised that she needed to have her resume up to date and in the RESUMIX system to be considered to get back to the GS-343-11 level that she held as a temporary.  (Exhibit 35, Rone/Johnson e-mail string of September 17, 2001 @ ROI page 519).

### Similarly Situated Employees

93.     The plaintiff alleges that Kathy Pemberton, Constance (Connie) Walker, Rachael Cowan, Burdetta (Birdie) Risher and John Tindall are similarly situated employees to the plaintiff who were treated more favorably than she.  (Exhibit 37, Plaintiff's EEO Complaint @ page 7; Exhibit 10, McGowan Affidavit @ ¶31; Exhibit 8, Plaintiff's Declaration @ ROI page 93).

94.     In June 1998, Kathy Pemberton applied for, and was competitively selected for Computer Specialist, GS-334-5/7/9/11, Career Ladder position at NETPDTC.  She progressed through the grades in accordance with the career ladder rules and retired at the GS-11.  (Exhibit 10, McGowan Affidavit @ ¶32.b; & Exhibit 36, Cook

22

Affidavit @ ROI page 128, ¶ #12).

95.    In June 1998, Constance (Connie) Walker applied for, and was competitively selected for Computer Specialist, GS-334-5/7/9/11, Career Ladder position.  She progressed through the grades in accordance with the career ladder rules. (Exhibit 36, Affidavit of Don Cook @ ROI page 128, ¶ #12;  Exhibit 10, McGowan Affidavit @ ¶ 32.d.).

96.    Rachel Cowen applied for and was competitively selected for a GS-343 7/9/11 Management Analyst career ladder position at NETPDTC on May 8, 1998.  She progressed through the grades in accordance with the career ladder rules.  Ms. Cowan was part of the original group of GS-343, Grade 12 N62 employees who were properly reassigned to the GS-334 PDs that were classified in 1996.   (Exhibit 10, McGowan Affidavit @ ¶32.a.;  Exhibit 23, Cowan Affidavit @ ¶¶4- 5).

97.    The plaintiff stated that Mr. Cook said that the only reason Rachael (Cowan) received IT pay is because she managed the MACS system, a database. (Exhibit 8, Plaintiff's Declaration @ ROI pages 95-96).

98.    The plaintiff admits that Rachael Cowan was a (GS) "9, then 11, then 12 in the Department."  (Exhibit 8, Plaintiff's Declaration @ ROI pages 93 & 99).

99.    Burdetta (Birdie) Risher came to NETPDTC as a GS-343-12 on October 8, 1995, from a local Pensacola Command that was being closed under the Base Realignment and Closure Act (BRAC).  That Command performed IT work.  Ms Risher was part of the original group of GS-343, Grade 12 N62 employees who were properly

23

reassigned to the GS-334 PDs that were classified in 1996 (Exhibit 10, McGowan Affidavit @ ¶32.c).

100.    When asked why she thought Ms. Cowan and Ms. Risher were treated differently than her, the plaintiff said it was because they received IT pay.  (Exhibit 29, Plaintiff's Affidavit @ ROI page 88).

101.    When asked why she believed the fact that she did not receive IT pay as soon as Ms. Cowan and Ms. Risher was due to the plaintiff's race or prior EEO activity, the plaintiff said that Ms. Cowan and Ms. Risher received IT pay before her and that she had to re-write her PD in order to obtain IT pay.  (Exhibit 29, Plaintiff's Affidavit @ ROI page 88).

102.    John Tindall transferred to NETPDTC as a GS-334-11 (Computer Specialist) in March 1995, when the NADEP Command was closed due to BRAC.  In June 1999, he applied and was competitively selected for a career ladder GS-334-11/12, and in August 1999 he was promoted on that career ladder to GS-12.  (Exhibit 10, McGowan Affidavit @ ¶32.e).

103.    Vicki Tipton came to NETPDTC in March 1987 when she applied for, competed for, and was assigned to a GS-343 career ladder position. She progressed through the ladder promotions to a GS-343-12 in 1993 in accordance with the career ladder rules. In September 2002, after classification by HRO of a 2210 PD and certification by Don Cook, she was assigned to an IT series PD.  In February 2003, she applied for and was competitively selected for a temporary GS-343-13 position.  In

24

December 2004, she applied for and was competitively selected for the permanent GS-343-13 position.  (Exhibit 10, McGowan Affidavit @ ¶32.f).

104.    "Career Ladder" promotion opportunities are open initially to all employees to compete.  Employees are evaluated aby the HRO and those employees who are qualified by the HRO are referred on a list of "eligibles" to NETPDTC.  Once an employee is selected from this list of referrals, these types of positions do not require further competition for promotion after the initial selection.  The individual selected completes developmental assignments and formal training which allow the employee to automatically progress and be promoted through the grade levels assigned to the position (GS-5, 7, 9, 11).  Normally, provided the training/developmental assignments are satisfactorily performed, the employee is promoted to the next level at 12 month intervals.  (Exhibit 10, McGowan Affidavit @ ¶25).

105.    Records indicate that the last competitive Career Ladder position filled in N6 occurred on September 21, 1999.  (Exhibit 10, McGowan Affidavit @ ¶26).

106.    Career Ladder opportunities are now mainly a non-competitive process filled through the co-operative education students who graduate with a four year degree and are then placed into entry level positions without competition.  (Exhibit 10, McGowan Affidavit @ ¶28).

107.    The records do not reveal that the plaintiff was on the referral list from HRO for any of the competitive Career Ladder opportunities in N6.  (Exhibit 10, McGowan Affidavit @ ¶27).

25

## The Plaintiff's Participation on the EEO Committee

108.    The plaintiff participated as a member of the Command's EEO Committee at the end of 2001 or early part of 2002.  (Exhibit 29, Plaintiff's Declaration @  ROI page 96).

109.    The plaintiff was on an EEO Committee at the time that she initiated her EEO Complaint.  (Exhibit 8, Plaintiff's Declaration @ ROI page 92).

110.    The extent of the plaintiff's activity as a member of the EEO Committee consisted of attending a couple of meetings.  (Exhibit 8, Plaintiff's Declaration @ ROI page 92).

111.    The plaintiff did not take action against anyone as an EEO Committee member but, rather, she describes her participation on the Committee as a "learning experience" for her.  (Exhibit 8, Plaintiff's Declaration @ ROI page 92).

112.    When asked why she believed that someone would retaliate against her because she attended a couple of EEO Committee meetings, the plaintiff stated, "I am not sure.  I don't know why I was singled out but I feel all of that had something to do with management's lack of action.  (Exhibit 8, Plaintiff's Declaration @ ROI page 92).

113.    The plaintiff stated that she was not on the EEO Committee at the time that she first sat down with Mr. Cook regarding her allegations.  (Exhibit 8, Plaintiff's Declaration @ ROI page 96).

114.    When asked if Mr. Cook knew that the plaintiff was a member of the EEO Committee, the plaintiff stated that she was not sure.  (Exhibit 8, Plaintiff's

26

Declaration @ ROI page 96).

### The Plaintiff's Additional Allegations of Discrimination

115.    The plaintiff refers to one day in April, 2000, when her supervisor at the time, Kitty Hendershott, required that the plaintiff stay after work and prepare a written summary of several files that were on the plaintiff's desk.  The plaintiff stated that there was no reason for this action except to harass.  (Exhibit 8, Plaintiff's Declaration @ ROI page 100 @ #1).

116.    The plaintiff also stated that no one covered her desk while she was on leave yet she was required "to work late until her desk was clean just to take leave." (Exhibit 8, Plaintiff's Declaration @ ROI page 100 @ #1).

117.    The plaintiff states that co-workers who worked as her Team Leader and members of her team were given cash awards in the 2000 performance award period while she wash not.  (Exhibit 8, Plaintiff's Declaration @ ROI page 100 @ #2).

118.    The plaintiff further alleges that when Rachael Cowan became her Team Leader, Ms. Cowan and Kitty Hendershott "began scrutinizing" the plaintiff's work "as if they were looking for mistakes/errors they could use to write me up, however, there were none to be found."  (Exhibit 8, Plaintiff's Declaration @ ROI page 100 @ #3).

### The Plaintiff's EEO Complaints

119.    On November 1, 2003, the plaintiff filed a formal complaint with the Navy EEO office, alleging she was discriminated against based on her race, color and reprisal. Her first allegation was that because of her race (Black), she was denied IT

pay/equal treatment in receiving IT pay from June 2001 until May 2002.   Her second allegation was that because of her race (Black), management failed to promote her to a higher grade while requiring her to perform higher level duties of her GS-12 team leader (Rachel Cowen) from September 2001.  She also alleged the discrimination was based on reprisal for her membership on the NETPDTC EEO Committee.  (Exhibit 37, Plaintiff's EEO Complaint @ ROI pages 3-7).

120.    In the Complaint that she filed with this Court on April 28, 2006, the plaintiff added a new (third allegation) on the basis of discrimination as harassment and hostile work environment that she had not previously raised in the formal administrative Complaint that she filed in November, 2003.   (Document 1, Plaintiff's Federal District Court Complaint, @ ¶ II.9. and III).

121.    On March 13, 2006, the plaintiff filed another formal administrative Complaint of discrimination with the agency, alleging a hostile work environment and harassment throughout her seven years at NETPDTC.  (Exhibit 3, McGowan Affidavit @ ¶32; Exhibit 38, Plaintiff's EEO Complaint, number 06-68322-00360).

122.    Following an alternative dispute resolution session, on March 23, 2006, the plaintiff entered into a Settlement Agreement on the formal administrative complaint filed on March 13, 2006, wherein she agreed not to institute any other actions, charges, complaints, class actions or appeals concerning the complaint, and further agreed that if any complaint against the activity regarding any matters related to this complaint was filed in any court, she would request the court to withdraw from the matter.  The plaintiff

specifically waived her right to sue over matters raised in the formal complaint which include an allegation of hostile work environment over her last seven (7) years at NETPDTC. (Exhibit 3, Myatt Affidavit @ ¶34; Exhibit 39 Copy of Settlement Agreement of 3/23/06).

## EXHIBITS

See the attached Exhibit List.

Pursuant to instructions from the Clerk of Court, because of the volume of records, the supporting exhibits are being submitted in hard copy.

Respectfully submitted,

GREGORY R. MILLER
UNITED STATES ATTORNEY

*/s/ Leah Ann Butler*
LEAH ANN BUTLER
Assistant United States Attorney
Florida Bar No.0611697
21 East Garden Street, Suite 400
Pensacola, Florida  32502
(850) 444-4000

 Of Counsel:

Carol M. Lynch
Assistant Counsel
Naval Education & Training Command
Office of Counsel (Code NOODA)
250 Dallas Street
Pensacola, FL 32508-5220
(850) 452-8571
Fax: (850) 452-4737

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to Cecile

M. Scoon, Esq., attorney for the plaintiff, on this $\underline{2^{nd}}$ day of October 2007.

<u>/s/ Leah Ann Butler</u>
Leah Ann Butler
Assistant United States Attorney
